Slip Op. 26-95

# UNITED STATES COURT OF INTERNATIONAL TRADE

CAMEL GROUP CO., LTD.,

        Plaintiff,

        v.

UNITED STATES OF AMERICA; DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; FORCED LABOR ENFORCEMENT TASK FORCE; ALEJANDRO MAYORKAS, in his official capacity as the Secretary of the Department of Homeland Security; TROY A. MILLER, in his official capacity as the Senior Official Performing the Duties of the Commissioner for U.S. Customs and Border Protection; ROBERT SILVERS, in his official capacity as Under Secretary for Office of Strategy, Policy, and Plans and Chair of the Forced Labor Enforcement Task Force,

        Defendants.

Before: Lisa W. Wang, Judge

Court No. 25-00022

## OPINION AND ORDER

[Remanding the determination of the Forced Labor Enforcement Task Force under the Uyghur Forced Labor Prevention Act.]

Dated:    August 14, 2026

Mark V. Heusel, Dickinson Wright PLLC, of Ann Arbor, MI, argued for Plaintiff Camel Group Co., Ltd. With him on the brief was Jacob L. Clark.

Monica P. Triana, Senior Trial Counsel, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for the Defendants. With her on the brief were Brett A. Shumate, Assistant Attorney General, Patricia M. McCarthy, Director, Justin R. Miller, Attorney-In-Charge, and Aimee Lee, Assistant Director.

Wang, Judge: This action arises out of the final determination of the Forced Labor Enforcement Task Force ("FLETF"), which denied Plaintiff Camel Group Co., Ltd.'s ("Camel Group") request for removal ("Removal Request") from a list of entities prescribed by section 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act ("UFLPA"), Pub. L. No. 117-78, 135 Stat. 1525 (2021). Memorandum from Robert Silvers, Under Sec'y of Homeland Sec., Off. of Strategy, Policy, and Plans, Forced Labor Enforcement Task Force Denial of Camel Group Co., Ltd. Request for Removal from the Uyghur Forced Labor Prevention Act Entity List (Sept. 4, 2024) ("Removal Request Denial"), ECF No. 19, AR10–AR17. Plaintiff moves for judgment on the agency record pursuant to CIT Rule 56.1. Pl.'s Mot. for J. on Agency R. ("Pl.'s Br."), ECF No. 48.

Plaintiff challenges several aspects of the FLETF's Removal Request Denial, arguing: (1) the FLETF exceeded its statutory authority by denying Camel Group's Removal Request based on the "reasonable cause to believe" standard; (2) the FLETF failed to adhere to the statutory definition of "out of" the Xinjiang Uyghur Autonomous Region ("XUAR"); and (3) the FLETF's determination was "not supported by an adequate, reasoned explanation" and unsupported by substantial evidence. See generally Pl.'s Br. Plaintiff seeks vacatur of the Removal Request Denial. Id. at 19. The United States et al. ("Defendants" or "government") ask the court to sustain the FLETF's Removal Request Denial. See Defs.' Resp. in Opp. to Pl.'s Mot. for J. on Agency R. ("Defs.' Resp. Br."), ECF No. 63.

For the following reasons, Plaintiff's motion for judgment on the agency record is

granted in part and denied in part.

## BACKGROUND

Plaintiff Camel Group is a publicly-listed company on the Shanghai Stock Exchange that offers battery-related products for internal combustion engines and pure electric models of automobiles. The Camel Group and its subsidiaries import such products into the U.S. market. Pl.'s Br. at 2; Compl. ¶ 2, ECF No. 5.

The FLETF was established by Executive Order 13923 in 2020 and is chaired by the United States Department of Homeland Security ("DHS"). 19 U.S.C. § 4681; Exec. Order No. 13923, Establishment of the Forced Labor Enforcement Task Force Under Section 741 of the United States-Mexico-Canada Agreement Implementation Act, 85 Fed. Reg. 30,587 (May 20, 2020) ("Executive Order 13923"). The FLETF is an interagency task force comprised of seven member agencies: (1) DHS; (2) the United States Trade Representative; (3) the United States Department of Justice; (4) the United States Department of Labor; (5) the United States Department of State; (6) the United States Department of the Treasury; and (7) the United States Department of Commerce ("Commerce").[1] See Notice Regarding the Uyghur Forced Labor Prevention Act Entity List, 88 Fed. Reg. 38,080, 38,081 (DHS June 12, 2023).

The FLETF is tasked with carrying out provisions of the UFLPA. Pub. L. No. 117-78, § 2, 135 Stat. 1525 (2021).

---

[1] DHS, as the FLETF Chair, has the authority to invite representatives from other executive departments and agencies as appropriate. See Executive Order 13923. Commerce is a member of the FLETF as invited by the FLETF Chair.

I.       **Uyghur Forced Labor Prevention Act**

The UFLPA stands on the pillar of section 307 of the Tariff Act of 1930, as amended ("section 307"), which has long prohibited the importation of foreign goods made by forced labor. Section 307 states, in relevant part:

> All goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited, and the Secretary of the Treasury is authorized and directed to prescribe such regulations as may be necessary for the enforcement of this provision.

19 U.S.C. § 1307.[2]

As directed by the United States–Mexico–Canada Agreement Implementation Act of 2020, the President established by executive order, the FLETF, "to monitor United States enforcement of the prohibition under [section 307]." 19 U.S.C. § 4681(a); see also Executive Order 13923.

In 2021, the UFLPA was enacted to "ensure that goods made with forced labor in the Xinjiang Uyghur Autonomous Region of the People's Republic of China do not enter the United States market," among other purposes. Pub. L. No. 117-78, 135 Stat. 1525 (2021). The law aimed to "strengthen the prohibition against the importation of goods made with forced labor, including by ensuring that the Government of the People's Republic of China does not undermine the effective enforcement of section

---

[2] Section 307 defines forced labor as "all work or service which is exacted from any person under the menace of any penalty for its non-performance and for which the worker does not offer himself voluntarily[,]" and includes forced or indentured child labor. 19 U.S.C. § 1307.

307 of the Tariff Act of 1930 ….” Id. § 1(1). Further, and among other statements of

policy,[3] Congress intended UFLPA "to address gross violations of human rights in the

Xinjiang Uyghur Autonomous Region … using all the authorities available to the United

---

[3] In full, section 1 of the UFLPA contains six statements of policy:
  (1) to strengthen the prohibition against the importation of goods made with forced labor, including by ensuring that the Government of the People's Republic of China does not undermine the effective enforcement of section 307 of the Tariff Act of 1930 (19 U.S.C. 1307), which prohibits the importation of all "goods, wares, articles, and merchandise mined, produced or manufactured wholly or in part in any foreign country by … forced labor";
  (2) to lead the international community in ending forced labor practices wherever such practices occur through all means available to the United States Government, including by stopping the importation of any goods made with forced labor, including those goods mined, produced, or manufactured wholly or in part in the Xinjiang Uyghur Autonomous Region;
  (3) to coordinate with Mexico and Canada to effectively implement Article 23.6 of the United States-Mexico-Canada Agreement to prohibit the importation of goods produced in whole or in part by forced or compulsory labor, including those goods mined, produced, or manufactured wholly or in part in the Xinjiang Uyghur Autonomous Region;
  (4) to actively work to prevent, publicly denounce, and end human trafficking including with respect to forced labor, whether sponsored by the government of a foreign country or not, and to restore the lives of those affected by human trafficking, a modern form of slavery;
  (5) to regard the prevention of atrocities as it is in the national interest of the United States, including efforts to prevent torture, enforced disappearances, severe deprivation of liberty, including mass internment, arbitrary detention, and widespread and systematic use of forced labor, and persecution targeting any identifiable ethnic or religious group; and
  (6) to address gross violations of human rights in the Xinjiang Uyghur Autonomous Region—
        (A) through bilateral diplomatic channels and multilateral institutions where both the United States and the People's Republic of China are members; and
        (B) using all the authorities available to the United States Government, including visa and financial sanctions, export restrictions, and import controls.
UFLPA § 1 (Statement of Policy).

States Government, including visa and financial sanctions, export restrictions, and import controls." Id. § 1(6)(B).

Congress tasked the FLETF to implement a "strategy to enforce [the] prohibition on importation of goods made through forced labor in the Xinjiang Uyghur Autonomous Region." Id. § 2. An element of this strategy includes a "comprehensive description and evaluation" of certain lists, which include:

  i.    [A] list of entities in the Xinjiang Uyghur Autonomous Region that mine, produce, or manufacture wholly or in part any goods, wares, articles and merchandise with forced labor;
  ii.   a list of entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region;
  iii.  a list of products mined, produced, or manufactured wholly or in part by entities on the list required by clause (i) or (ii);
  iv.   a list of entities that exported products described in clause (iii) from the People's Republic of China into the United States;
  v.    a list of facilities and entities, including the Xinjiang Production and Construction Corps, that source material from the Xinjiang Uyghur Autonomous Region or from persons working with the government of the Xinjiang Uyghur Autonomous Region or the Xinjiang Production and Construction Corps for purposes of the "poverty alleviation" program or the "pairing-assistance" program or any other government labor scheme that uses forced labor.

Id. § 2(d)(2)(B)(i)–(v).

Section 3 of the UFLPA provides that for entities listed pursuant to clause (i), (ii), (iv) or (v) of section 2(d)(2)(B), U.S. Customs and Border Protection ("Customs") must apply a presumption that any imports "mined, produced, or manufactured wholly or in part in the Xinjiang Uyghur Autonomous Region of the People's Republic of China or produced by an entity on a list" are prohibited from entry into the United States by section 307. Id. § 3(a). The presumption is rebuttable if the importer of record meets

certain procedural requirements and demonstrates to Customs "by clear and convincing evidence, that the good, ware, article, or merchandise was not mined, produced, or manufactured wholly or in part by forced labor." Id. § 3(b).

To effectuate the UFLPA, the FLETF released its strategy to Congress on June 17, 2022. DHS, Strategy to Prevent the Importation of Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China (2022) ("FLETF Strategy"), https://www.dhs.gov/sites/default/files/2022-06/22_0617_fletf_uflpa-strategy.pdf (last visited July 16, 2026). This document provided an initial list of entities ("UFLPA Entity List") that were "subject to the presumption that their products are prohibited from entry into the United States under 19 U.S.C. § 1307, effective June 21, 2022." Id. at 22. The Camel Group was not on this initial list. The FLETF, however, stated that "any future updates, will be published in the Federal Register" and that it "intends to update the UFLPA Entity List multiple times per year." Id. at 22, 58.

## II.     The FLETF's Actions Related to the Camel Group

On August 2, 2023, DHS, as the chair of the FLETF, published a Federal Register notice placing the Camel Group on the UFLPA Entity List. Notice Regarding the Uyghur Forced Labor Prevention Act Entity List, 88 Fed. Reg. 50,902, 50,904 (DHS Aug. 2, 2023) ("Camel Group Listing Notice"). Specifically, the Camel Group was added to the UFLPA Entity List pursuant to section 2(d)(2)(B)(ii) of the UFLPA, which identifies "entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region." Id.

Although not in the Camel Group Listing Notice, the FLETF subsequently

informed the Camel Group that its placement on the UFLPA Entity List was based on

the following evidence:

> UFLPA Entity List Package 23-004 added Camel Group to the list described in Section 2(d)(2)(B)(ii) of the UFLPA (Attachment 11). Package 23-004 identifies a February 2022 Sheffield Hallam University report, Financing & Genocide: Development Finance and the Crisis in the Uyghur Region and a July 10, 2017, announcement from Toksun County's official WeChat page (which is also cited in the Financing & Genocide report). The Toksun County WeChat announcement identifies Camel Group as one of several companies that participated in a "handover ceremony" coordinated by the Toksun County government in Turpan Prefecture in Xinjiang that received workers in 2017 from Kashgar and Hotan, which are Uyghur-majority areas in southern Xinjiang. The handover ceremony was conducted under the Toksun County labor transfer program known as the "Three-year Plan for the Autonomous Prefecture to Promote the Organized Transfer and Employment of Urban and Rural Surplus Labor Forces in Kashgar, Hotan Region (2017-2019)" ….

Removal Request Denial at AR10.

The Camel Group Listing Notice provided that "[a]ny listed entity may submit a

request for removal (removal request) from the UFLPA Entity List along with supporting

information to the FLETF Chair." 88 Fed. Reg. at 50,904 (DHS Aug. 2, 2023). The

notice provided that such a request should include "information that demonstrates that

the entity no longer meets or does not meet the criteria described in the applicable

clause ((i),(ii), (iv), or (v)) of section 2(d)(2)(B) of the UFLPA." Id.

### III.    The FLETF's Denial of the Camel Group's Removal Request

On November 7, 2023, the Camel Group submitted a request to the FLETF

seeking to be removed from the UFLPA Entity List. Removal Request Denial at AR10.

In its request, the Camel Group provided certifications and affidavits, employee lists,

corporate records and other documents to support its argument that the Camel Group

"did not participate in or benefit from any labor transfer programs." Id. at AR11. The

Camel Group also argued that, notwithstanding its denial of participation in a labor

transfer program, the program identified by the FLETF ended in 2019, and as such,

could not have met the contemporaneity requirements of the UFLPA. Id. Subsequently,

the FLETF sought answers to follow-up questions, and identified additional information

for inclusion in the administrative record. See id.

On July 9, 2024, the FLETF notified the Camel Group through its counsel that

"that the information provided by Camel Group as part of its removal request did not

demonstrate that Camel Group either does not meet or no longer meets the criteria

described in Section 2(d)(2)(B)(ii) of the UFLPA." Letter from DHS to Mark V. Heusel,

"The Forced Labor Enforcement Task Force's Decision Regarding Camel Group Co.,

Ltd.'s Request for Removal from the Uyghur Forced Labor Prevention Act Entity List"

(July 9, 2024), AR2977–AR2987. Specifically, the FLETF provided the following

explanation to the Camel Group:

> The FLETF determined that Camel Group did not provide sufficient, credible information to demonstrate it did not and does not participate in Toksun County government's labor transfer programs to recruit, transfer, or receive workers from Uyghur-majority areas in southern Xinjiang.
>
> Based on publicly available information from 2017, 2023, and 2024 illustrating continued Toksun County implementation of labor transfer schemes and Camel Group participation in Toksun County-sponsored labor recruitment events, the FLETF has reasonable cause to believe that Camel Group is working with the Toksun County government to recruit individuals from Uyghur-majority areas who are likely Uyghurs, Kazakhs, and/or Kyrgyz. These sources therefore cast doubt on Camel Group's assertion that it has not employed anyone through the Labor Transfer Program.

Id. at AR2979.

As a result, the FLETF determined that the Camel Group would "remain on the UFLPA Entity List." Id. at AR2977. The FLETF stated that its decision denying Camel Group's request for removal "is not appealable [to the administrative entity]; however, Camel Group may submit a new request for removal if it can provide new information to support such a request." Id. at AR2979.

This appeal followed. On January 15, 2025, under 28 U.S.C. § 1581(i), Plaintiff filed a complaint seeking judicial review of the FLETF's Removal Request Denial. See Compl. A protective order was entered on May 21, 2025. ECF No. 25 ("Protective Order"). On June 18, 2025, Plaintiff filed a motion for in camera review of certain documents designated as "Confidential Information"[4] that Plaintiff believed should have been unredacted as public information, or in the alternative, redesignated as "Camel Confidential Information."[5] Pl.'s Mot. and Br. in Supp. of In Camera Review, ECF No. 32. The parties submitted various filings on this motion between June and July 2025. See ECF Nos. 35, 37, 38, 39, 41, 42. On September 9, 2025, the court denied Plaintiff's motion. ECF Nos. 43, 44.

Plaintiff filed its CIT Rule 56.1 motion for judgment on the agency record on

---

[4] "Confidential Information" includes, among other types of protections, "information, data, and documents the disclosure of which, to, or by, the receiving party would, in the good faith belief of the producing party, result in the disclosure of … law enforcement sensitive information or other similarly sensitive government information, including information designated as 'for official use only.'" Protective Order ¶ 1.

[5] "Camel Confidential Information" is information that would otherwise be considered Confidential Information but "may be disclosed to officers or directors of Camel Group Co., Ltd." Protective Order ¶ 7.

September 29, 2025. Pl.'s Br. Defendants filed their opposition on January 29, 2026.

Defs.' Resp. Br. Plaintiff filed its reply on February 26, 2026. Pl.'s Reply in Supp. of Mot.

for J. on Agency R., ECF No. 65. Oral arguments were held on May 14, 2026. ECF No.

68.

## JURISDICTION AND STANDARD OF REVIEW

The court has exclusive jurisdiction over this action pursuant to 28 U.S.C. §

1581(i) "[b]ecause the UFLPA is a 'law … providing for … embargoes.'" Ninestar Corp.

v. United States, 666 F. Supp. 3d 1351, 1363 (CIT 2023) (quoting 28 U.S.C. §

1581(i)(1)(c)).

28 U.S.C. § 2640(e) provides that actions falling within the court's "residual"

jurisdiction under 28 U.S.C. § 1581(i) are subject to the standard of review set forth in

the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. See Humane Soc'y of the

United States v. Clinton, 236 F.3d 1320, 1324 (Fed. Cir. 2001) ("[T]his Court will apply

the standard of review set forth in 5 U.S.C. § 706 to an action instituted pursuant to 28

U.S.C. § 1581(i)."); see also Cal. Steel Indus., Inc. v. United States, 745 F. Supp. 3d

1287, 1296 (CIT 2024); Ninestar Corp. v. United States, 687 F. Supp. 3d 1308, 1314

(CIT 2024) ("Ninestar II"). Section 706 of the APA directs, in relevant part, the court to

"set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law" or "in excess of

statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2).

The scope of the arbitrary and capricious standard is narrow; courts are not to

substitute their judgment for that of the agency. Motor Vehicle Mfrs. Ass'n of United

States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). The United

States Court of Appeals for the Federal Circuit ("Federal Circuit") has cautioned that the

"arbitrary and capricious" standard is "'highly deferential' to the administrative agency's

factual findings." Humane Soc'y, 236 F.3d at 1325.

However, even under this standard, the FLETF must have "examine[d] the

relevant data and articulate[d] a satisfactory explanation for its action including a

'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs.

Ass'n, 463 U.S. at 43 (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S.

156, 168 (1962)). The Federal Circuit has explained:

> Courts have found an agency's decision to be arbitrary and capricious when
> the agency "entirely failed to consider an important aspect of the problem,
> offered an explanation for its decision that runs counter to the evidence
> before the agency, or [the decision] is so implausible that it could not be
> ascribed to a difference in view or the product of agency expertise."

Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir.

2009) (alteration in original) (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43).

## DISCUSSION

The court has not had occasion to review the government's actions in reviewing

a party's request to be removed from the UFLPA Entity List.[6]

Here, Plaintiff challenges several aspects of the FLETF's Removal Request

Denial, contending that: (1) the FLETF exceeded its statutory authority by denying

---

[6] In the years since the enactment of the UFLPA, the court has had occasion to review
the government's actions with respect to placement of a company on the UFLPA Entity
List. See Ninestar II, 687 F. Supp. 3d at 1308. The Camel Group does not challenge its
placement on the UFLPA Entity List. See Pl.'s Br. at 15–16.

Camel's Removal Request based on the "reasonable cause to believe" standard; (2) the FLETF failed to adhere to the statutory definition of "out of" the XUAR; and (3) the FLETF's determination was "not supported by an adequate, reasoned explanation" and unsupported by substantial evidence. See generally Pl.'s Br. Plaintiff seeks vacatur of the Removal Request Denial. Id. at 19. The government asks the court to sustain the FLETF's Removal Request Denial. See Defs.' Resp. Br.

The court addresses each claim in turn.

## I.      Burden of Proof Before the Agency for UFLPA Entity List Removal Requests

### A.      Party Bearing the Burden of Proof

The first issue is which party bears the burden of proof before the agency for removal requests from the UFLPA Entity List. The court has previously found that, in initial listing decisions, the burden of proof is on the FLETF, and that "[r]easonable cause is the appropriate burden of proof …." Ninestar II, 687 F. Supp. 3d at 1333. The court, however, has yet to address the appropriate burden of proof in requests for removal from the UFLPA Entity List, and which party bears this burden.

On these outstanding issues, Plaintiff argues that it is incumbent on the FLETF to demonstrate, based on a "preponderance of evidence," whether the evidence submitted by a requesting party has met the requirements for removal from the UFLPA Entity List. Pl.'s Br. at 39–40. That is because, according to Plaintiff, "[i]n an agency action that denotes sanctions, as in this case, the agency (FLETF), as the proponent of the decision, has the burden of proof to support it with 'substantial evidence.'" Id. at 15 (citing Steadman v. S.E.C., 450 U.S. 91, 98 (1981)). Plaintiff argues that "the FLETF

provided no evidence to rebut the supporting evidence and explanations provided by Camel Group in its Removal Petition and Responses." Comp. ¶ 181.

Defendants maintain that their decision to deny Plaintiff's Removal Request was lawful, but offer contradictory claims as to their rationale. For example, in sections of their brief, Defendants argue that when a party requests its removal from the UFLPA Entity List, "they must show sufficient evidence to establish that there is no longer 'reasonable cause to believe' that the statutory requirements are met." Defs.' Resp. Br. at 49.[7] Thus, in Defendants' view, the burden of proof before the agency is incumbent on the requester and is based on the sufficiency of evidence provided to the FLETF by the requester.

Despite protestations to Plaintiff's burden, in other sections of their brief, Defendants also argue that "the same burden of proof that this Court has already applied to a FLETF listing decision – reasonable cause to believe that the statutory requirements have been met – applies equally to a decision by the FLETF to deny an

---

[7] Defendants also argue that Plaintiff waived its argument regarding the appropriate burden of proof in removal decisions as "Camel did not claim, in its Complaint, that the FLETF's application of the reasonable cause to believe standard exceeded its statutory authority." Defs.' Resp. Br. at 40 (emphasis in original). A complaint must provide the Defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests," but need not be exhaustive. DaimlerChrysler Corp. v. United States, 442 F.3d 1313, 1320 (Fed. Cir. 2006); see also Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1062 (Fed. Cir. 2012). Here, Plaintiff alleged in count 3 of its complaint that the FLETF's actions were in excess of its statutory authority. Compl. ¶¶ 185–88. The issue of the appropriate burden of proof for removal from the UFLPA Entity List was then briefed in Plaintiff's Rule 56.1 motion as a FLETF action that exceeded its statutory authority. See Pl.'s Br. at 37–43. In such circumstances, Defendants had fair notice of Plaintiff's claim. Plaintiff's argument is not waived.

entity's request for removal from the UFLPA Entity List." Defs.' Resp. Br. at 17. These arguments suggest that Defendants share in Plaintiff's contention that the FLETF has the burden of proof for removal request decisions.

Both parties are incorrect. As an initial matter, there is a difference between the burden of proof that a party is required to make before the agency, and the responsibility of this court to review decisions of that agency based on the applicable standard of review. As the Federal Circuit has explained:

> The burden of proof and the scope of review in administrative law cases, as in ordinary judicial proceedings, are separate matters. The former is the measure of belief which legally must exist in the mind of the trier of fact in order to sustain a finding. The scope of review, of course, marks the bounds of a reviewing court's authority to set aside factual findings, and review is customarily limited to ascertaining whether there is enough evidence of the legally correct sort to save the findings from irrationality.

Rodriguez v. Dep't of Veterans Affs., 8 F.4th 1290, 1299 (Fed. Cir. 2021).

At times, the parties treat the burden of proof before the agency and the standard of review as interchangeable concepts, but the arbitrary and capricious standard used by this court is not and cannot be substituted for the burden of proof in the underlying proceeding before the FLETF.

In proceedings before the court, "the ordinary default rule [is] that plaintiffs bear the risk of failing to prove their claims." Schaffer v. Weast, 546 U.S. 49, 56 (2005) (citing 2 J. Strong, McCormick on Evidence § 337, at 412 (5th ed. 1999) ("The burdens of pleading and proof with regard to most facts have been and should be assigned to the plaintiff who generally seeks to change the present state of affairs and who therefore naturally should be expected to bear the risk of failure of proof or persuasion.")). The

Supreme Court has explained that "Congress also expressed its approval of the general rule when it chose to apply it to administrative proceedings under the Administrative Procedure Act, 5 U.S.C. § 556(d)." Id. at 57. In other words, for administrative proceedings, the party seeking to change "the present state of affairs" bears the burden of proof.

As such, parties requesting removal from the UFLPA Entity List bear the initial burden of proof before the agency, as they are the ones seeking to change the present state of affairs.[8] Here, once the government placed the Camel Group on the UFLPA Entity List, it is Plaintiff that must meet the burden of proof before the agency to obtain its removal. Such a shift in the burden of proof is inherent in situations when parties seek removal from government sanctions or embargo lists. See e.g., 19 C.F.R. § 12.42 (providing that once an import entry is subject to a withhold release order under section 307, "the importer [must] establish[ ] by satisfactory evidence that the merchandise was not mined, produced, or manufactured in any part with the use of a class of labor specified in the finding."); 15 C.F.R. § 744.16(e) (setting out procedures for companies to meet when seeking removal from Commerce's export control-related entity lists).

**B.      Burden of Proof Before the Agency for UFLPA Entity List Removal Requests**

Having established that parties requesting removal from the UFLPA Entity List bear the burden of proof before the agency, the court turns to the appropriate burden of

---

[8] It follows from this directive that the FLETF carries the burden of proof in the initial designation of a company on the UFLPA Entity List. See Ninestar II, 687 F. Supp. 3d at 1308.

proof in such proceedings.

Defendants propose that the appropriate burden of proof in agency removal request proceedings is "reasonable cause to believe." Defs.' Resp. Br. at 39.[9]

Plaintiff argues that the "UFLPA provides a higher standard of proof for post-listing decisions like removal decisions." Pl.'s Br. at 39. The court agrees. The higher burden of proof before the agency, however, is incumbent on the party requesting removal from the UFLPA Entity List. That is, a party requesting removal from the UFLPA Entity List must demonstrate by clear and convincing evidence to the agency that it no longer meets or does not meet the criteria of section 2(d)(2)(B)(i), (ii), (iv), or (v) of the UFLPA. The court then reviews the FLETF's removal decisions to determine whether it was arbitrary and capricious, or otherwise not in accordance with law.

The statutory scheme of the UFLPA supports the application of this standard. The relevant portion of the statute first provides that Customs shall "apply a presumption that … [imports] … produced by an entity on a list required by clause (i), (ii), (iv), or (v) of section 2(d)(2)(B)" are prohibited under section 307. UFLPA § 3(a). Thus, by virtue of its placement on the UFLPA Entity List based on clause (ii) of section 2(d)(2)(B) of the UFLPA, all of Plaintiff's imports would be presumptively prohibited from

---

[9] The court in Ninestar II reasoned that because the UFLPA is silent as to the burden of proof for a listing decision, an appropriate analogue would be withhold release orders issued by Customs pursuant to section 307. Ninestar II, 687 F. Supp. 3d at 1334 ("Reasonable cause … better strengthens forced labor enforcement by bringing UFLPA listing decisions in line with section 307 WROs and avoiding that statutory asymmetry."). Here, there is no need to reference analogues when the statute itself provides the burden of proof for modification requests from the lists required by section 2(d)(2)(B)(i), (ii), (iv), or (v) of the UFLPA.

entry into the United States under section 307.

The statute further instructs that an entity like Plaintiff may seek to rebut this

presumption by meeting certain criteria:

> (b) EXCEPTIONS. – The Commissioner shall apply the presumption under subsection (a) unless the Commissioner determines—
>> (1) that the importer of record has--
>>> (A) fully complied with the guidance described in section 2(d)(6) and any regulations issued to implement that guidance; and
>>> (B) completely and substantively responded to all inquiries for information submitted by the Commissioner to ascertain whether the goods were mined, produced, or manufactured wholly or in part with forced labor; and
>> (2) by clear and convincing evidence, that the good, ware, article, or merchandise was not mined, produced, or manufactured wholly or in part by forced labor.

Id. § 3(b).

Thus, in order to import products from a company on the UFLPA Entity List, an

importer, among other procedural requirements, must show by "clear and convincing

evidence, that the good, ware, article, or merchandise was not mined, produced, or

manufactured wholly or in part by forced labor." Id. § 3(b)(2) (emphasis added). The law

is clear that each entry of imports from a company on the UFLPA Entity List must meet

the clear and convincing evidence standard in order to rebut the presumption of section

3(a) of the UFLPA. There are no allowances for repeat importations, nor is there a

company-wide exception to the presumption.

Allowing a lower burden of proof, such as a preponderance of the evidence

standard or reasonable cause to believe standard,[10] to apply to companies that produce or export these products would mean that a company en toto could more easily meet the import exceptions of the UFLPA than the company's individual shipments. Such an allowance would result in the type of "statutory asymmetry" that the court in Ninestar II cautioned would follow from the adoption of a preponderance standard in listing decisions and would fail to reflect the "unique challenges to forced labor enforcement involving Xinjiang." See Ninestar II, 687 F. Supp. 3d at 1334; Sucic v. Wilkie, 921 F.3d 1095, 1098 (Fed. Cir. 2019) ("It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"). The statute does not allow for a company to be removed from the UFLPA Entity List using a less stringent burden of proof than would be required for all of the company's individual goods.

In sum, the party requesting removal from the UFLPA Entity List must demonstrate by clear and convincing evidence to the agency that it no longer meets or does not meet the criteria of section 2(d)(2)(B)(i), (ii), (iv), or (v) of the UFLPA.

Given the lack of clarity from the FLETF, the court grants Plaintiff's motion for a remand of the Removal Request Denial for further consideration on this issue. See Ala.

---

[10] The Federal Circuit has explained that "[a] requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt. 'Clear and convincing' evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'" Price v. Symsek, 988 F.2d 1187, 1191 (Fed. Cir. 1993) (internal citations omitted).

Aircraft Indus., 586 F.3d at 1375. Specifically, on remand, the FLETF should reconsider Plaintiff's request for removal from the UFLPA Entity List to determine if Plaintiff has demonstrated by clear and convincing evidence that it no longer meets or does not meet the criteria of section 2(d)(2)(B)(i), (ii), (iv), or (v) of the UFLPA.[11] The court expresses no opinion on whether the FLETF should reopen the record of the underlying proceeding in conducting its remand redetermination. See Essar Steel Ltd. v. United States, 678 F.3d 1268, 1278 (Fed. Cir. 2012) ("The decision to reopen the record is best left to the agency ….").

---

[11] Citing only to cases outside of this circuit, Plaintiff argues that vacatur of the FLETF's Removal Request Denial is needed because "[r]emand without vacatur of an agency decision is only appropriate in exceptional cases where an agency is likely to remedy a deficiency on remand and vacatur would be especially disruptive." Pl.'s Br. at 46–47 (citing to D.D.C. cases). This court, however, has found that remand without vacatur is appropriate "where the failure [of the agency] lay in lack of reasoned decision-making [or] where the order was otherwise arbitrary and capricious." Māui & Hector's Dolphin Defs. NZ Inc. v. Nat'l Marine Fisheries Serv., 799 F. Supp. 3d 1327, 1348 (CIT 2025). Thus, in determining whether remand without vacatur is appropriate, the court should consider two factors: (1) "the seriousness of the order's deficiencies"; and (2) "the disruptive consequences of an interim change that may itself be changed." Id.

Here, remand of the decision lies in the FLETF's lack of reasoned decision-making. Further, as the court in Ninestar II opined, "vacatur in this case would risk severe disruption of Congress's forced labor priorities." Ninestar II, 687 F. Supp. 3d at 1337, n.25. The court agrees, and finds that vacatur is not appropriate here, as "[r]emand without vacatur may indeed be well suited to preserve, rather than disrupt, Congress's weighty humanitarian, economic, and foreign policy concerns." Id.

## II.      Meaning of "Out of" the Xinjiang Uyghur Autonomous Region

The next issue is one of statutory interpretation regarding the meaning of "out of" as it is used in the phrase, "out of" the XUAR, in section 2(d)(2)(B)(ii) of the UFLPA.

Plaintiff argues the FLETF erred in its Removal Request Denial because "[i]n order to satisfy the UFLPA listing burden, an entity must be working with the PRC government to 'recruit, transport, transfer, harbor, or received [sic]' forced labor of Uyghurs and other persecuted minorities <u>out of XUAR</u>." Pl.'s Br. at 28 (emphasis in original). According to Plaintiff, this statutory language requires the FLETF to have made a finding that the Camel Group transferred individuals out of the XUAR. <u>Id</u>. Plaintiff maintains that FLEFT failed to make the relevant finding by "solely [focusing] on alleged recruitment in Toksun County for Camel's Xinjiang entities." <u>Id</u>.

Defendants respond that "[t]his language 'out of the' XUAR in subsection (ii) very clearly means <u>from</u> the XUAR." Defs.' Resp. Br. at 33 (emphasis in original). Per Defendants, "[i]t would be illogical for the statute to cover entities that worked with the government of Xinjiang to receive Uyghur workers who are being transported to another region of China, but not cover entities that worked with the government of Xinjiang to receive Uyghur workers who are transported within Xinjiang." <u>Id</u>.

Neither party has the best reading of the statute. <u>See</u> <u>Loper Bright Enters. v. Raimondo</u>, 603 U.S. 369 (2024). Section 2(d)(2)(B)(ii) of the UFLPA requires the FLETF to provide:

> [A] list of entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor <u>or</u> Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region.

UFLPA § 2(d)(2)(B)(ii) (emphasis added). The use of the term "or" (as emphasized above) identifies two distinct groups:

1. Entities that are working with the government of the XUAR to recruit, transport, transfer, harbor or receive <u>forced labor</u>; and

2. Entities that are working with the government of the XUAR to recruit, transport, transfer, harbor or receive <u>Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region</u>.

The phrase "out of" the XUAR does not modify the first group. For "out of" the XUAR to modify both groups, a comma would need to proceed this phrase.[12] <u>Facebook, Inc. v. Duguid</u>, 592 U.S. 395, 403–404 (2021) ("As several leading treatises explain, '[a] qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one.'").

Without the preceding comma, the most conventional reading of the term "out of" the XUAR is a modification of the words grouped before it (i.e., the identified persecuted groups). <u>Facebook, Inc.</u>, 592 U.S. at 402–403 ("Under conventional rules of grammar, '[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'"); <u>see also</u> Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u>

---

[12] In other words, Plaintiff's argument would be persuasive if the statute was written as such: "[A] list of entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups, out of the Xinjiang Uyghur Autonomous Region." UFLPA § 2(d)(2)(B)(ii) (emphasized comma added).

147 (2012). As such, the phrase "out of" the XUAR relates to the words grouped in the list before it, rather than modifying the subsection as a whole.

Therefore, as to the first group, the recruitment, transport, transfer, harboring, or receipt of forced labor is not limited to a particular persecuted group. Thus, an entity working with the government of the XUAR to, for example, recruit forced labor would fall within the definition of section 2(d)(2)(B)(ii) regardless of the ethnicity of those recruited for forced labor. Plaintiff's attempt to impose a requirement that the forced labor be transported away from the XUAR in order to be actionable by the FLETF does not comport with English grammar.

The actionable items of the statute "to recruit, transport, transfer, harbor or receive" modify both "forced labor" and the identified persecuted groups. Thus, the second group of section 2(d)(2)(B)(ii) relates to those entities working with the government to recruit, transport or transfer Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups from the XUAR to another region, or for those entities working with the government to harbor or receive these persecuted groups once they are moved from the XUAR to another region. The plain meaning of "out of" is a function word "to indicate direction or movement from within to the outside of." Out of, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/out%20of (last visited July 16, 2026). Here, "out of" refers to the directionality of the actions specified in the statute from within the XUAR to outside of the region.

Defendants argue that the term "out of" the XUAR means "from the XUAR" (i.e., those whose origins or residence are within the XUAR). Defs.' Resp. Br. at 33. This

interpretation, however, is in conflict with other sections of the statute that describe persecuted groups with origins in the XUAR as "members of other persecuted groups <u>in the</u> Xinjiang Uyghur Autonomous Region." UFLPA § 6(2) (emphasis added); <u>see also</u> § 2(a)(1) ("including by Uyghurs, Kazakhs, Kyrgyz, Tibetans, and members of other persecuted groups <u>in the</u> People's Republic of China, and especially <u>in the</u> Xinjiang Uyghur Autonomous Region.") (emphases added). That is, the statute uses the phrase "in the" XUAR to identify persecuted groups with origins in the XUAR, or those who may be colloquially referred to as "from the" XUAR.

The Federal Circuit has explained that "it is a well-established rule of statutory construction that normally 'identical words used in different parts of the same act are intended to have the same meaning.'" <u>Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs</u>, 260 F.3d 1365, 1379 (Fed. Cir. 2001) (quoting <u>Gustafson v. Alloyd Co., Inc.</u>, 513 U.S. 561, 570 (1995)); <u>see also</u> Scalia & Garner, <u>Reading Law: The Interpretation of Legal Texts</u> at 170 ("[A] word or phrase is presumed to bear the same meaning throughout a text."). It would follow from this rule that, in enacting the statute, Congress presumably used the same words to convey the same meaning throughout a text. Here, the statute uses the same phrase, "in the" XUAR, to refer to persecuted groups with origins in the region. The phrase "out of" the XUAR is best understood as going from within the XUAR to outside of the region.

These conclusions are the best reading of the statute when considering both its plain meaning, and the objective and structure of the act as a whole. <u>See</u> <u>Centripetal Networks, Inc. v. Cisco Sys., Inc.</u>, 38 F.4th 1025, 1031 (Fed. Cir. 2022) (in cases of

statutory interpretation, "[o]ur 'starting point is the language of the statute,' but we also 'look to the provisions of the whole law, and its object and policy ….'"); <u>Offshore Logistics, Inc. v. Tallentire</u>, 477 U. S. 207, 220–221 (1986) (finding that the meaning of a phrase was clarified by the language and purpose of the act as a whole); <u>Timex V.I., Inc. v. United States</u>, 157 F.3d 879, 882 (Fed. Cir. 1998) ("The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning.").

The UFLPA aims "to actively work to prevent, publicly denounce, and end <u>human trafficking</u> including with respect to forced labor, whether sponsored by the government of a foreign country or not …." UFLPA § 1(4) (emphasis added). Such a reading also addresses concerns regarding a PRC government program known as "Xinjiang Aid," in which "ethnic minority workers were assigned <u>out of</u> Xinjiang to work in factories in eastern Chinese provinces through labor transfer programs." FLETF Strategy at 20 (emphasis added).

In sum, Plaintiff has failed to show that the FLETF erred in denying its Removal Request based on its interpretation of the phrase "out of" as it is used in UFLPA § 2(d)(2)(B)(ii).

## III.     Other Challenged Aspects of the FLETF's Removal Request Denial

Plaintiff challenges several other aspects of the FLETF's Removal Request Denial as unsupported by "an adequate, reasoned explanation," arguing that: (1) the "FLETF failed to consider CBP's previous decisions that Camel's products were not subject to the UFLPA[,]" Pl.'s Br. at 34–35; (2) the FLETF "harmed" the Camel Group's right to due process, including by "fail[ing] to disclose its conflict of interests," <u>id</u>. at 43–45; and (3) the FLETF impermissibly based its decision on evidence not previously

considered in the listing proceeding. Id. at 29.[13] The court addresses each in turn.

### A.      Relevance of Customs' Entry-Specific Determinations

Plaintiff argues the FLETF failed to consider Customs' "previous decisions that

Camel's products were not subject to the UFLPA." Pl.'s Br. at 34. Defendants respond

that such an assertion is a "misunderstanding of the law," and that Customs' previous

decisions regarding Camel's individual imports "[are] not determinative of, or relevant to,

whether Camel Group itself has met the criteria for inclusion on the UFLPA Entity List."

Defs.' Resp. Br. at 38.

Defendants are correct that previous, entry-specific determinations by Customs

regarding goods entered by a subsidiary of Plaintiff are not determinative of Plaintiff's

status on the UFLPA Entity List. For a company seeking removal from the UFLPA Entity

List, the focus of the query is on the company and its working relationship with the

government of the XUAR. See UFLPA § 2(d)(2)(B)(ii) (tasking the FLETF to identify

entities "working with the government of the Xinjiang Uyghur Autonomous Region to

recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz,

---

[13] Plaintiff also argues that proceedings to remove an entity from the UFLPA Entity list are "formal adjudications" under the APA, and as such, must follow the procedural requirements for formal adjudication. Pl.'s Br. at 39–40.

An agency adjudication is not a formal adjudication for purposes of the APA unless the relevant statute requires the adjudication to be conducted "on the record after opportunity for an agency hearing." 5 U.S.C. § 554(a); Walls v. United States, 582 F.3d 1358, 1377 (Fed. Cir. 2009); American Airlines, Inc. v. Dep't of Transp., 202 F.3d 788, 797 (5th Cir. 2000). The UFLPA contains no such language and, thus, removal proceedings are informal agency adjudications. See UFLPA § 2. Where an agency is not required to conduct a formal adjudication "an agency can define its own procedures for conducting an informal adjudication." Am. Airlines, 202 F.3d at 797.

or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region.").

For specific import entries, the focus of the query is on the shipments themselves. Specifically, once a company is subject to the rebuttable presumption of section 3(a) of the UFLPA, Customs must determine if each entry of imported goods by such a company was "mined, produced, or manufactured wholly or in part by forced labor." UFLPA § 3(b)(2). Demonstrating that one import entry was not mined, produced, or manufactured wholly or in part by forced labor does not preclude the FLETF from finding that the company itself may be working with the Xinjiang government to, for example, transport Uyghurs out of the XUAR.

Plaintiff further argues that the FLETF "impermissibly dismissed" Customs' previous decisions "without any explanation whatsoever." Pl.'s Br. at 34. Plaintiff is incorrect. The Removal Request Denial contains an explanation of the FLETF's thinking on this issue:

> Although not the focus of its removal request, Camel Group also highlights in its removal request that a subsidiary, Camel Energy, has had shipments detained by U.S. Customs and Border Protection and ultimately released. In particular, it highlights an email received from CBP on September 13, 2023, stating that it had reviewed Camel Energy Inc.'s "applicability documentation" … and that Camel Energy Inc. "has provided sufficient documentation to support their claim that shipment was not manufactured with forced labor." (RR23-003, Exh.14). CBP prepared a note to file that clarifies that during the review … it did not consider whether forced labor was present in the supply chain, despite that statement being included in the e-mail. (Attachment 12). Camel includes this discussion in its removal request to show that despite a "stellar record of successfully seeking (and obtaining) CBP UFLPA-detention releases" it was still added to the UFLPA Entity List and that this successful record should be taken into account by the FLETF when reviewing RR23-003. (RR23-003, pg. 5-6, 19). However, the CBP assessments of individual entries by a Camel Group subsidiary do

not preclude or restrict the FLETF from making an assessment that Camel Group meets the statutory criteria for placement on the UFLPA Entity List.

Removal Request Denial at AR11, n.1.

Although not Plaintiff's preferred outcome, such analysis is a "satisfactory explanation for its action including a rational connection between the facts found and the choice made." Timken United States Corp. v. United States, 421 F.3d 1350, 1355 (Fed. Cir. 2005). The court will not disturb such calls. See United States Steel Group – a Unit of USX Corp. v. United States, 96 F.3d 1352, 1362 (Fed. Cir. 1996).

## B.     Due Process Arguments

Next, Plaintiff argues that "Camel has established 'minimum contacts' and is entitled to Constitutional due process protections." Pl.'s Br. at 43–44. Plaintiff asserts its "Fifth Amendment due process rights" were "trampled on … throughout the delisting process, causing its Removal Decision to be unlawful." Id. Defendants respond that "[P]laintiff has not identified any liberty or legally protected property interest" and that the FLETF's consideration of Plaintiff's removal request "afforded all the process [Plaintiff] was due." Defs.' Resp. Br. at 49–50.

It is well-established that the "Constitution does not provide a right to import merchandise" or afford a "protectable interest to engage in international trade." Int'l Custom Prods., Inc. v. United States, 791 F.3d 1329, 1337 (Fed. Cir. 2015) (citations omitted); see also NEC Corp. v. United States, 151 F.3d 1361, 1369 (Fed. Cir. 1998) ("[E]ngaging in foreign commerce is not a fundamental right protected by notions of substantive due process."); Arjay Assocs., Inc. v. Bush, 891 F.2d 894, 896 (Fed. Cir.

1989) ("It is beyond cavil that no one has a constitutional right to conduct foreign commerce in products excluded by Congress.").

Here, Plaintiff fails to assert a legally protected right or property interest. As to procedural due process considerations, by Plaintiff's own account, the FLETF provided procedures for companies seeking removal from the UFLPA Entity List. See Pl.'s Br. at 7–13. The FLETF followed these procedures in its Removal Request Denial. AR10–AR17. Plaintiff's dissatisfaction with its results does not amount to a due process violation. See Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 655–656 (1990) ("The determination in this case, however, was lawfully made by informal adjudication, the minimal requirements for which are set forth in § 555 of the APA … A failure to provide [additional procedural protections] where the Due Process Clause itself does not require them … is therefore not unlawful.").

Plaintiff further argues that the FLETF's "failure to disclose its conflict of interest and actions during the administrative process" is a due process violation. Pl.'s Br. at 18, 43–45. Plaintiff's concern centers around an employee of DHS that it alleges is "[t]he [same] person that manufactured and published the evidence against Camel." Id. at 44. According to Plaintiff, this employee "was now the same person advising on the adjudication of Camel's Removal Petition." Id. Defendants respond that "[t]hese assertions are unfounded." Defs.' Resp. Br. at 51.

Plaintiff's allegations are merely speculative. The Federal Circuit has explained that "there inheres in a statutory scheme … an expectation that those charged with its administration will act fairly and honestly. That proposition is not based on blind hope or

naivete, but on a shared expectation of how the Government will conduct itself." Nec

Corp., 151 F.3d at 1371; see also Parsons v. United States, 670 F.2d 164, 166 (Ct. Cl.

1982) ("It is well established that there is a presumption that public officers perform their

duties correctly, fairly, in good faith, and in accordance with law and governing

regulations, and the burden is on the plaintiff to prove otherwise."); Haley v. Department

of the Treasury, 977 F.2d 553, 558 (Fed. Cir. 1992).

In Nec Corp., the Federal Circuit surveyed the Supreme Court's jurisprudence on

an administrative agency's "prejudgment" of a particular case, and found that a party

"can prevail on its claim of prejudgment only if it can establish that the decision maker is

not 'capable of judging a particular controversy fairly on the basis of its own

circumstances.'" Nec Corp., 151 F.3d at 1373 (quoting Hortonville Joint School Dist. v.

Hortonville Education Asso., 426 U.S. 482, 493 (1976)). The Federal Circuit explained

that "[t]his standard is met when the challenger demonstrates, for example, that the

decision maker's mind is 'irrevocably closed' on a disputed issue." Id. (quoting FTC v.

Cement Institute, 333 U.S. 683, 701 (1948)); see also NSA Telecomms. Records Litig.

v. AT&T Corp., 671 F.3d 881, 900 (9th Cir. 2011) ("It is well established that

'[a]dministrators . . . may hold policy views on questions of law prior to participating in a

proceeding.'").

Here, Plaintiff has presented no evidence that the decisionmakers in this case –

the voting members of the FLETF – were incapable of casting their vote fairly, or that

their minds were "irrevocably closed" to the issue. See Camel Group Listing Notice, 88

Fed. Reg. at 50,904 ("Following review of the removal request by the FLETF member

agencies, the decision to remove an entity from the UFLPA Entity List will be made by majority vote of the FLETF member agencies.").

Beyond mere aspersions, Plaintiff has not shown how the employment of a DHS policy advisor is a conflict of interest or due process violation. See Spezzaferro v. F.A.A., 807 F.2d 169, 173 (Fed. Cir. 1986) ("Government officials are presumed to carry out their duties in good faith.").

### C.     Evidence Not Previously Considered in the Listing Proceeding

Plaintiff argues that "[i]n order for FLETF to support the Removal Decision, there must be substantial evidence showing that the Labor Transfer Program is ongoing and that Camel is still participating." Pl.'s Br. at 29. Plaintiff asserts that the program that served as the original basis for its listing ended in 2019, but that "[u]pon seeing contradictory evidence that completely challenges its conclusion, FLETF cannot now go back to try and change its allegations to encompass other programs." Id., n.15.

Defendants counter that there are "no retroactivity concerns" with the evidence in this case, and that "public records support a conclusion that the transfer of laborers throughout China, and in the XUAR, continued." Defs.' Resp. Br. at 27–28.

The responsibilities of the FLETF for listing and removal decisions are separate and distinct. As this court explained, an initial listing decision is for the FLETF to determine if there is reasonable cause to believe that a party should be placed on the UFLPA Entity List based on the criteria set out in section 2(d)(2)(B) of the UFLPA. See Ninestar II, 687 F. Supp. 3d at 1336.

Once a company is placed on the UFLPA Entity List, the statute requires the FLETF to submit periodic "updates" on the UFLPA Entity List to the appropriate

congressional committees. UFLPA § 2(e)(2). In other words, the UFLPA Entity List is not static. Should new information come to light, including from parties requesting a removal from the UFLPA Entity List, the FLETF has an ongoing responsibility to update and maintain the lists required by section 2(d)(2)(B) of the UFLPA. See Camel Group Listing Notice, 88 Fed. Reg. at 50,903. These periodic reviews of the FLETF's strategy may encompass additional or new information. See id. ("The FLETF will consider future additions to, or removals from, the UFLPA Entity List based on criteria described in clauses (i), (ii), (iv), or (v) of Section 2(d)(2)(B) of the UFLPA. Any FLETF member agency may submit a recommendation(s) to add, remove, or make technical corrections to an entry on the UFLPA Entity List. FLETF member agencies will review and vote on revisions to the UFLPA Entity List accordingly.").

Thus, FLETF's removal decisions need not be limited to the information used for the listing decision, and may include new information as submitted, among others, by a FLETF member agency or the party requesting removal.

The court need not address the remainder of Plaintiff's arguments regarding the sufficiency of the Removal Request Denial pending the FLETF's remand redetermination.

**CONCLUSION**

For the foregoing reasons, the FLETF's Removal Request Denial is sustained in part and remanded in part for further proceedings not inconsistent with this opinion.

Upon consideration of the papers and proceedings herein, it is hereby:

**ORDERED** that Plaintiff's motion to vacate the FLETF's Removal Request Denial is denied;

**ORDERED** that the FLETF's Removal Request Denial is remanded in part for a reconsideration not inconsistent with this opinion;

**ORDERED** that Defendants shall file a remand redetermination within forty-five (45) days following the date of this Opinion and Order; and

**ORDERED** that the deadlines provided in CIT Rule 56.2(h) shall govern thereafter.


/s/      Lisa W. Wang
Lisa W. Wang, Judge

Dated:     August 14, 2026
               New York, New York